Filed 12/4/17

## CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RYAN OSMEN SUAREZ,<br><br>    Defendant and Appellant. | F070210<br><br>(Super. Ct. No. CRM028288)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County. Ronald W. Hansen, Judge.

Danalynn Pritz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Robert C. Nash, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part VIII. of the Discussion, the Disposition, and the Concurring and Dissenting Opinion are certified for publication.

**See Concurring and Dissenting Opinion**

## *INTRODUCTION*

An information filed in the Merced County Superior Court charged Ryan Osmen Suarez with the murder of John Cordero.  (Pen. Code, § 187, subd. (a).)  The information further alleged Suarez (1) personally and intentionally discharged a firearm causing great bodily injury or death (*id*., § 12022.53, subd. (d)); (2) personally used a firearm (*id*., § 12022.5) within the meaning of Welfare and Institutions Code[1] section 707, subdivision (d)(2)(B); and (3) committed the offense for the benefit of, or in association with, a criminal street gang (Pen. Code, § 186.22, subd. (b)).  Although Suarez committed the offense when he was 15 years old, he was tried as an adult in criminal court.  The victim was 15 years old as well.

A jury convicted Suarez of first degree murder and found the enhancement allegations true.  The court sentenced Suarez to an aggregate, unstayed term of 50 years to life in state prison.  Suarez now appeals his conviction and sentence, making a series of arguments.

Suarez claims the evidence was insufficient for a reasonable jury to find the elements of deliberation and premeditation, required for a conviction of first degree murder, were proven beyond a reasonable doubt, thereby necessitating modification of the judgment to reflect a conviction of second degree murder.  He next contends the trial court was required, sua sponte, to instruct the jury on subjective provocation, and, in the alternative, that trial counsel was ineffective for failing to request such an instruction.  He also argues that the standard instruction on heat of passion manslaughter given by the trial court was both erroneous and prejudicial to the extent it precluded the jury from considering Suarez's young age in evaluating the adequacy of any provocation; he further argues, in the alternative, that counsel was ineffective in failing to request a modification

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

of the standard instruction to include consideration of his youth. Suarez next contends the court abused its discretion in admitting evidence of gang membership that was irrelevant, more prejudicial than probative, and cumulative under Evidence Code section 352, and that constituted impermissible propensity evidence under Evidence Code section 1101, subdivision (a). Suarez also makes a claim of cumulative error, which he argues requires reversal of his conviction. As to his sentence, Suarez contends it constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution, as interpreted by *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*).

In the unpublished portion of this opinion, we reject each of these contentions. We conclude, however, that in light of his Eighth Amendment argument, Suarez is entitled to a limited remand of the matter pursuant to *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), to augment the sentencing record. In *Franklin*, our Supreme Court found the defendant's Eighth Amendment argument was moot in light of newly enacted Penal Code section 3051, which requires that defendants in Suarez's position receive a youth offender parole hearing before the Board of Parole Hearings during their 25th year of incarceration. *Franklin* provides for a limited remand to permit a defendant in this position to prepare an adequate record, under new procedures announced in *Franklin*, for the eventual youth offender parole hearing. (*Franklin,* at pp. 269, 284; *People v. Perez* (2016) 3 Cal.App.5th 612, 619 (*Perez*).) We further conclude Suarez is entitled, upon remand, to have the trial court exercise its discretion whether to strike the firearm enhancements.

While this appeal was pending, the electorate passed Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57 or the Act), in the general election held on November 8, 2016.[2] The parties filed supplemental briefs on the issue whether

---

[2] Unless otherwise specified, references to this enactment are to those portions of the Act applicable only to juvenile offenders.

3.

Proposition 57 is retroactively applicable to this case. As we explain in the published portion of this opinion, we conclude it is not. Accordingly, Suarez is not entitled to a conditional reversal and remand for a fitness/transfer hearing in juvenile court, and failure to afford him such a remand does not violate equal protection.

## FACTS[*]

The prosecution's theory at trial was that the murder, which took place on June 23, 2013, in South Dos Palos Park, was an act of gang retaliation.[3] The prosecution presented evidence that Suarez was a Norteño gang member and Cordero a Sureño gang member. The prosecution further presented evidence that in recent years, local Norteños and Sureños had been fighting for control over the park in which the murder took place. Finally, the prosecution presented evidence that a local Norteño gang member had been killed by Sureños in the days preceding the murder, which would be expected to prompt Norteños to kill a Sureño in retaliation.

**The Shooting**

The prosecution opened its case with the eyewitness testimony of Veronica F., who knew both Suarez and Cordero and was herself 15 years old at the time of the murder, having just finished her freshman year in high school. Veronica and Cordero were friends from middle school. On Sunday afternoon, June 23, Veronica and Cordero met up at South Dos Palos Park. The park was deserted. Veronica and Cordero sat down on a park bench, facing each other, to talk.

They had not been sitting and chatting for very long when Veronica, following Cordero's gaze, looked over her shoulder and saw a solitary figure walking along a trail in the park. As the figure came closer, Veronica realized it was Suarez, a family friend whom she had known since the second grade. Suarez was wearing a "white T-shirt" that

---

[*]     See footnote, *ante*, page 1.

[3]     Unspecified dates in our recitation of facts are to the year 2013.

4.

day. Cordero asked Veronica who the approaching figure was; Veronica responded that "it was Ryan."

As Suarez approached, he addressed Cordero in a hostile tone, saying something to the effect of, "what are you looking at?" In response, Cordero said something along the lines of "nothing" or "[w]hat's up then." Veronica testified as to what happened next: "I seen John like, he started standing up and he was like running and I looked back and I saw Ryan pulling out a gun and he started running." When Veronica saw Suarez pull the gun from his waistband, she immediately also started running, but in a different direction than the direction Cordero was heading in. As she ran, she heard gunshots. She testified, "I looked back and I saw like—well, I heard John like yell and he fell on the floor and then I heard more gunshots." She explained that while Cordero lay on the ground, Suarez was "[p]ointing the gun and shooting" in a downward direction at Cordero. Suarez did not threaten Veronica with the gun. As for Cordero's role, Veronica neither saw him with a weapon, nor did she see him attempt to attack Suarez.

After the shooting, Veronica ran down a trail and hid behind a tree. Suarez ran toward an apartment complex across from the park. Veronica did not see anyone else with Suarez. Veronica was "a hundred percent sure" Suarez was the shooter.

Veronica called her house in a panic. Her older brother, I.F., answered the phone. Veronica was hysterical and very emotional. She kept saying, "let me talk to my mom, let me talk to my mom." I.F. passed the phone to their sister but overheard Veronica say, "they shot my friend."[4] Veronica told her sister to call the police. Dispatch received a 911 call about the incident at 2:44 p.m. that day.

I.F. had also overheard Veronica tell their sister that she was at the park, so he quickly drove there. En route, he saw Veronica "walking/running" home, so he stopped.

---

**4** Veronica clarified during her testimony that although she used the phrase "they shot my friend," she was referring to only one person.

Veronica told him, "Ryan shot my friend." I.F. continued on to the park and found Cordero lying on the ground. I.F. asked him whether he was okay, but Cordero only rolled his eyes up and then closed them. When Cordero did not respond further, I.F. decided to inform Cordero's family of the situation. As I.F. was leaving the park to do so, he saw Suarez running in the street; I.F. had known Suarez as a family friend for years.

Deputy Ruben Orozco took a statement from Veronica at the scene. Veronica said that when Suarez walked toward Cordero and herself, he said to Cordero, "What's up, fool? What you looking at?" or "What you staring at?" Veronica also said that Cordero responded, "Nothing fool." After giving this statement, Veronica "pretty quick[ly]" picked Suarez from a photographic lineup and identified him as the person who shot Cordero.

**The Investigation at the Scene**

Within an hour of the shooting, Merced County Sheriff's deputies started their investigation by searching the shooting site. Seven spent shell casings and one deformed copper bullet were found during the initial search. Four of the casings were Winchester brand, nickel in color, and three were PMC brand, brass in color. The shell casings were all nine-millimeter Luger casings. Although the weapon at issue was not found, investigators suspected it was a semiautomatic nine-millimeter Glock pistol. The shell casings were grouped together in the same area and were 25 to 30 feet from some clothing found at the scene. The deformed bullet was located about 10 to 15 feet from the clothing.

The clothing recovered from the scene included a pair of blue jeans, a blue cloth belt, a blue shirt, blue Nike tennis shoes, black socks, and a blue hat with a black bill. The hat had "Los Angeles" in white lettering and the logo L.A. in blue; the "n" in "Angeles" was covered by a strategically placed logo. The blue jeans and shirt were soaked in blood and the shirt had bullet holes in it. The jeans appeared to have been cut

6.

off by emergency medical personnel.  A kitchen or steak knife with a gray handle was found near the clothing.

Deputies obtained a search warrant and searched Suarez's house later that same day; another search was conducted on July 2.  Suarez lived with two of his brothers, who were both in their early twenties.  During the searches, deputies found six PMC nine-millimeter brass rounds, which were consistent with the three PMC brass casings found at the scene of the murder.  Deputies also found copper-jacketed bullets that were consistent with the copper bullet found at the crime scene.  The ammunition was found in an open porch at the front of the residence, where it was hidden just below the roof line, behind fascia board.

On June 24, the day after the initial crime scene investigation, Detective Mike Ruiz, one of the lead detectives on the case, brought a metal detector to the crime scene. With the aid of the metal detector, he and another deputy found three additional bullets in the ground, about an inch and a half under the topsoil.

The shell casings and spent bullets found at the park were sent to the Department of Justice for analysis.  Testing revealed that all seven of the expended nine-millimeter shell casings were fired from the same gun, a Glock nine-millimeter pistol.  Detective Jose Sanchez, another lead detective, inferred there was only one shooter, given that all the casings at the scene were found within a centralized location and were traced to the same gun.

**Video Surveillance Footage**

Sheriff's investigators obtained video surveillance footage from the apartment complex across from South Dos Palos Park, toward which Veronica saw Suarez run after the shooting.  The apartment complex's camera faced the park.  The video footage showed a little boy, E.L., riding his bike and a person in a white T-shirt and dark shorts running in the background.

E.L., who was going into sixth grade, testified for the prosecution. He lived in a house next door to the apartment complex. E.L. recognized himself riding around on his bike in the video. He also recognized the person running in the background as "Manuel's little brother," whom he identified in court as Suarez. Manuel was a friend of E.L.'s father and lived next door to E.L. As Suarez ran past E.L., he said to E.L., "you didn't see anything." Three days after E.L. first identified Suarez to Detective Ruiz in the video, he was presented with a photographic lineup and picked out Suarez as the person who was running in the video.

**Suarez's Arrest and Police Statements**

Suarez was arrested in Mendota, about 24 miles from Dos Palos. After his arrest, he was interrogated by Detectives Sanchez and Ruiz. Suarez told the detectives he lived with his older brothers, at the address where police had executed the search warrant.

Suarez said that on June 23, he woke up at 10:00 a.m., having spent the night at the house of his girlfriend, Destiny D. Thereafter, he met "T," E.L.'s father and a friend of Suarez's brother, near the park. Later in the interrogation, Suarez said he woke up at noon and left for Merced with T, who picked him up from a park near Destiny's house. They stopped at a taco truck in Firebaugh for food, and arrived in Mendota at 3:00 p.m. When told Mendota is relatively close to Dos Palos, Suarez explained that he and T had also stopped in Merced, where T had some business to attend to at a bank, and in El Nido, where they had some burritos.

T testified that he did not take Suarez anywhere on June 23. T had not used his car for some time because its registration was not current. The jury was shown photographs of the car, which had been parked in T's front yard for the last six months. The car was covered with spider webs and bird droppings.

**Autopsy Findings**

Dr. Mark Super, a forensic pathologist, performed the autopsy. Cordero was in blue checkered or plaid boxer shorts at the autopsy. Cordero had been shot twice, once in

the left side of the back near the shoulder blade and once in the posterior right thigh. The shot to the back went through the left chest area, striking the left lung and heart and perforating the lower part of the breast bone before exiting from the mid-abdomen area. The shot to the back of the right thigh struck and fractured the femur before exiting just above the knee. The autopsy did not reveal the order in which, or the distance from which, the two shots that hit Cordero were fired. However, the wounds to Cordero's body could have been inflicted by shots fired from a distance of 15 to 30 feet. Toxicology tests were negative for alcohol, common illegal drugs, and a range of medications.

### Gang Evidence

The prosecution introduced gang evidence through Detective Sanchez, as well as through the People's designated gang expert, Merced County Sheriff's Deputy Deborah French. Both Sanchez and French testified that Norteños and Sureños are enemies. Norteños use the color red and the number 14 to identify themselves; Sureños use the color blue and the number 13 for the same purpose.

Sanchez described Norteño gang paraphernalia seized during searches of Suarez's room on June 23 and July 2. Among the items seized was a pencil drawing depicting the state of California in outline with Southern California crossed out; the drawing also depicted the number "14," the letters "S-K" with the "S" crossed out, and the words "Scrap Killer."[5] Another drawing had "Rest in Piece [*sic*], Sapo" written on it; "Sapo" was the moniker of a deceased gang member. A third drawing depicted the "NorCal symbol made up of the bear and the star," which is associated with Norteños.

Sanchez also described Sureño gang indicia in Cordero's room. Cordero's room appeared to be a sea of blue. The door, walls, bed covering, curtains, and trashcan were all blue. The clothing and shoes in the room were largely in various shades of blue.

---

[5] "Scrap" is "a derogatory term for Sureños."

9.

Many of the garments were "South Pole" brand, a brand commonly worn by members of the Sureño gang. Cordero's room was an obvious reflection of Sureño gang membership. Sanchez also noted, the day Cordero was murdered he was wearing a blue rosary and all-blue clothing, including blue underwear.

Sanchez and French also discussed what they described as Norteño and Sureño graffiti in the park where the shooting occurred. Photographs of the graffiti were shown to the jury. The park went back and forth between Norteño and Sureño control. French testified that over the past year, there was more Norteño graffiti in the park, indicating that Norteños had taken it over. The park appeared to be Norteño territory at the time of the shooting.

French testified to the elements of the gang sentencing enhancement alleged in the information. She said the Norteños are a criminal street gang, with probably 1,000 Norteños in Merced County. Norteño "higher ups" in state prison send out orders to Norteño "shot callers" on the street. The primary activities of the Norteños include shootings, drive-by shootings, assaults, robberies, burglaries, narcotics sales, vandalism, and graffiti tagging. French also described a number of predicate offenses committed by Norteño members in the local area. Regarding the Sureños, French testified the Sureños also are a criminal street gang, with approximately 500 Sureños in Merced County. The Sureños' primary activities include shootings, drive-by shootings, assaults with deadly weapons, robberies, burglaries, narcotics sales, and graffiti tagging.

The Norteños and Sureños have been rivals since the early 1960's. Norteños and Sureños have been engaged in a turf war in Dos Palos. These gangs are constantly engaging in verbal and physical altercations, crossing out their rivals' graffiti, perpetrating drive-by shootings, and assaulting each other's members. On June 18, three Sureños drove by and shot at two Norteños walking down a Dos Palos street, killing one Norteño. French did not know whether Suarez was aware of that killing.

10.

French opined that Suarez was an active member of the Norteño gang. Her opinion was based on his self-admissions during contacts with law enforcement, jail classification reports, police reports, conversations with other law enforcement officers, and the drawings found in his room. French also testified about several gang-related incidents involving Suarez.

French opined that Cordero was an active member of the Sureño gang. Cordero did not have a history of law enforcement contacts, but his father had described him as a Sureño gang member when Cordero temporarily went missing in June 2011. The color of Cordero's room and belongings, as well as the brand of his clothing, indicated he was a Sureño. Cordero was dressed entirely in blue on the day of the shooting, further reflecting his Sureño affiliation.

French opined that the murder was committed to promote criminal gang activity. In formulating this opinion, she considered a number of factors. Specifically, the park was controlled by Norteños and a Norteño, i.e., Suarez, lived only 100 yards away from the park. As an active Sureño member, Cordero's presence at the park would be a sign of disrespect, and any Norteño witnessing Cordero's presence would be obligated, on account of gang loyalty, to retaliate violently to the apparent disrespect. Given this context, a Norteño would retaliate against a Sureño's mere presence in the park; further, a Norteño would react violently to a Sureño because Sureño members had shot a Norteño only a few days earlier. French explained that gang members gain respect by committing violent crimes on behalf of their gang, and the quicker they retaliate to any evident disrespect, the stronger the message to rival gangs that they are a force to be reckoned with.

**Defense Case**

Suarez did not present any defense witnesses.

11.

## *DISCUSSION*

### I.  *Sufficiency of the Evidence as to Deliberation and Premeditation*[*]

The jury found Suarez guilty of first degree murder.  Suarez contends the evidence at trial was insufficient as to the jury's finding of deliberation and premeditation.  Specifically, Suarez argues, "The People failed to prove, beyond a reasonable doubt, that the murder was carried out with premeditation and deliberation, and not as a result of an unconsidered, or rash impulse."  We reject this contention.

The standard of review for a challenge to the sufficiency of the evidence supporting a conviction is well established:

> " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] … We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

First degree murder includes the elements of deliberation and premeditation.  (Pen. Code, § 189; *People v. Burney* (2009) 47 Cal.4th 203, 235.)  "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.)  An intentional killing is deliberated and premeditated when it results from " ' "preexisting thought and reflection rather than unconsidered or rash impulse." ' " (*Burney,* at p. 235.)  More specifically, " ' " 'premeditated' means 'considered beforehand' and 'deliberate[d]' means 'formed or

---

[*]     See footnote, *ante*, page 1.

12.

arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " ' " (*Ibid*.)  However, with respect to the mental process of deliberation and premeditation, the " ' "true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " (*Koontz*, at p. 1080.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, our Supreme Court identified three kinds of evidence that can be considered in evaluating the existence of deliberation and premeditation:  planning activity, motive, and manner of killing.  The court has cautioned that these factors "are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420; see *People v. Jurado* (2006) 38 Cal.4th 72, 118–119 [" '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation' "].)

Here, there is no direct evidence that Suarez actually deliberated and premeditated before shooting Cordero.  Nonetheless, when taken together, the manner-of-killing evidence and evidence of a gang-related motive for the killing, although circumstantial, constitute substantial evidence from which a reasonable factfinder could find, beyond a reasonable doubt, that Suarez acted with deliberation and premeditation.

The evidence demonstrated Suarez was walking through a neighborhood park with a loaded firearm concealed in his waistband.  Although the park was deserted, he went in a direction that brought him within 10 feet of the bench on which Cordero and Veronica were sitting.  Suarez chose to interact with Cordero in a hostile manner, stating, in an aggressive tone, something to the effect of "what are you looking at?"  Cordero said, in response, "nothing" or "[w]hat's up then."  Suarez then pulled a gun from his waistband, at the sight of which both Cordero and Veronica immediately started running away in different directions.  Suarez ran after Cordero and fired at him multiple times from

13.

behind, as Cordero attempted to flee away. Veronica heard Cordero yell out in pain and saw him fall to the ground. She then saw Suarez shoot Cordero again. Specifically, she saw Suarez point the gun in a downward direction and aim it at Cordero, who was lying incapacitated on the ground, and then she saw and heard the gun fire. Although a knife was found near the spot where Cordero collapsed, there was no evidence Cordero had in fact wielded the knife or threatened Suarez in any way. Furthermore, there was no evidence Suarez acted in the grip of intense emotion, distress, or fear.

There was also indirect evidence that Suarez harbored a gang-related motive for the killing: searches of Suarez's and Cordero's rooms indicated Suarez was a Norteño and Cordero a Sureño; there was abundant other evidence in the record that Suarez was a Norteño; Cordero was dressed from head to toe in clothing that identified him as a Sureño; the park where the killing occurred had been tagged with oppositional graffiti from both Norteños and Sureños, indicating a turf war; and a Norteño had been shot and killed by Sureños only a few days before the murder.

This record reflects substantial evidence from which a rational factfinder could find, beyond a reasonable doubt, that the defendant acted with deliberation and premeditation in murdering Cordero. Although there was minimal evidence of planning activity other than the fact that Suarez was carrying a loaded firearm, the manner-of-killing evidence in conjunction with evidence of a gang-related motive was sufficient to support the jury's verdict.

II. *Instruction on Subjective Provocation as it Relates to Deliberation and Premeditation*[*]

Suarez contends the trial court was required, sua sponte, to instruct the jury on subjective provocation and, further, to specifically instruct the jury that the prosecution was required to prove the absence of subjective provocation, or heat of passion arising

---

[*] See footnote, *ante*, page 1.

14.

from subjective provocation, beyond a reasonable doubt. He further contends the CALCRIM pattern instruction on first degree murder is not a correct statement of the law. Suarez argues:

> "[W]hen, as here, the issue of whether the defendant was subjectively provoked is fairly presented, the People must prove the **absence** of unreasonable heat of passion, beyond a reasonable doubt, in order to prove the premeditation and deliberation elements of first degree murder; and thus, the court has a sua sponte duty to instruct on subjective provocation. Because the standard instruction on first degree murder, premeditation and deliberation (CALCRIM 521), does not contain any language directing the jury's attention to whether subjective provocation, may have affected [Suarez's] ability to premeditate or deliberate, it is not a correct statement of law."

Suarez posits that because CALCRIM No. 521 does not expressly state that subjective provocation "can reduce a homicide from first to second degree murder if it impairs the defendant's ability to premeditate and deliberate," it lowers the prosecution's burden of proof as to these elements. He contends that in order to cure this deficiency, the trial court was required sua sponte to instruct the jury on subjective provocation, and further to specifically instruct the jury that the prosecution was required to prove the absence of subjective provocation beyond a reasonable doubt. We reject the contentions that CALCRIM No. 521 does not correctly state the law and that the trial court was required sua sponte to instruct the jury on subjective provocation.

First degree murder is reduced to second degree murder when premeditation and deliberation are negated by heat of passion arising from provocation. (*People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295–1296.) Unlike the objective heat of passion inquiry in the context of voluntary manslaughter, the test of provocation sufficient to preclude deliberation and premeditation is entirely subjective. "If the provocation would not cause an average person to experience deadly passion but it precludes the defendant from subjectively deliberating or premeditating, the crime is second degree murder." (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332 (*Hernandez*).) More

15.

specifically, the test is whether "the defendant's decision to kill was a direct and immediate response to the provocation such that the defendant acted without premeditation and deliberation." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1705, citing *People v. Wickersham* (1982) 32 Cal.3d 307, 329.)[6] Thus, the provocation sufficient to mitigate first degree murder to second degree murder requires only a finding that the defendant's subjective mental state was such that he did not deliberate and premeditate before deciding to kill. (*Fitzpatrick*, at pp. 1295–1296.)

Suarez's contentions are foreclosed by *People v. Rogers* (2006) 39 Cal.4th 826 (*Rogers*). In *Rogers*, the defendant "assert[ed] the trial court erred in failing to instruct on its own motion that provocation inadequate to reduce a killing from murder to manslaughter nonetheless may suffice to negate premeditation and deliberation, thus reducing the crime to second degree murder." (*Id*. at pp. 877–878.) *Rogers* noted that CALJIC No. 8.73, the CALJIC pattern instruction on subjective provocation (and counterpart of CALCRIM No. 522) "explain[ed] this concept" (*Rogers,* at p. 878) but nonetheless held that "[b]ecause CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction.' "[7]

---

[6] *Wickersham* was disapproved on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 201.

[7] The version of CALJIC No. 8.73 at issue in *Rogers* provided: "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing of a human being, but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the first or second degree." (*Rogers, supra*, 39 Cal.4th at p. 878, fn. 26.)

CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder."

16.

(*Rogers,* at p. 878.) Numerous other cases have similarly found that instructions on subjective provocation, including CALCRIM No. 522 (the CALCRIM pattern instruction on subjective provocation), are pinpoint instructions. (See e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 778 [CALJIC No. 8.73 is pinpoint instruction because it "relates particular facts to an element of the charged crime and thereby explains or highlights a defense theory"], disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2; *Hernandez, supra*, 183 Cal.App.4th at p. 1333 [trial court not required to give CALCRIM No. 522, as it had no duty "to instruct on provocation for second degree murder *at all*"]; *People v. Middleton* (1997) 52 Cal.App.4th 19, 30–33 (*Middleton*) [CALJIC No. 8.73 is pinpoint instruction to be given on request], disapproved on another ground in *People v. Gonzalez* (2003) 31 Cal.4th 745, 752, fn. 3; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1732–1734 [CALJIC No. 8.73 is pinpoint instruction because it relates certain evidence to element of offense so as to raise reasonable doubt as to that element].)

Suarez attempts to distinguish *Rogers*. He argues that *Rogers* could properly characterize CALJIC No. 8.73 as a pinpoint instruction, because in that case the jury was also instructed with CALJIC No. 8.20, the standard CALJIC instruction on first degree murder, deliberation, and premeditation. Suarez explains that because CALJIC No. 8.20 states generally that a sudden heat of passion can suffice to negate deliberation, a more specific instruction on subjective provocation properly may be seen as a pinpoint instruction in cases in which CALJIC No. 8.20 is also given. Suarez further contends the instruction given in the instant case, CALCRIM No. 521 (the CALCRIM analog to CALJIC No. 8.20), omits any mention of the concept that heat of passion can negate deliberation and hence is not a correct statement of the law. Suarez's argument is unpersuasive because CALCRIM No. 521 is, in conceptual terms, substantively similar to CALJIC No. 8.20.

CALJIC No. 8.20, states, in pertinent part: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to

kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." CALCRIM No. 521, in the standard form given in the instant case, similarly makes clear that both deliberation and premeditation are required for first degree murder, and specifies that "[*a*] *decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated*." (Italics added.) CALCRIM No. 521, in the standard form given here, adds that "[t]he People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime" and that, "[i]f the People have not met this burden, you must find the defendant not guilty of first degree murder." [8]

---

[8]  The jury was instructed pursuant to CALCRIM No. 521, as follows:

> "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant *acted with premeditation* if he decided to kill before completing the act that caused death.

> "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time.

> "The requirements for second degree murder based on express or implied malice are explained in CALCRIM No. 520, *First or Second Degree Murder With Malice Aforethought*.

> "The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the

18.

CALJIC No. 8.20 and CALCRIM No. 521 both specify that deliberation and premeditation are required elements of first degree murder and clarify that rash and unconsidered actions are not deliberate and premeditated, thereby encompassing a potential defense theory that the defendant acted without due deliberation and reflection because of a subjective mindset instigated by provocation. Further, CALCRIM No. 521 requires the People to prove the elements of first degree murder, including deliberation and premeditation, beyond a reasonable doubt. CALCRIM No. 521 is thus conceptually and substantively analogous to CALJIC No. 8.20, does not lower the People's burden of proof as to the elements of deliberation and premeditation, and is a correct statement of the law.

*Rogers*'s holding is thus controlling here. Under *Rogers*, CALCRIM No. 522 and other instructions on subjective provocation are pinpoint instructions that relate "evidence of provocation to the specific legal issue of premeditation and deliberation" so as to highlight a particular defense theory. (*Rogers*, *supra*, 39 Cal.4th at p. 878.) Accordingly, the trial court was not required to give an instruction on subjective provocation absent a defense request. (See *People v. Wilkins* (2013) 56 Cal.4th 333, 348–349, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119 ["Pinpoint instructions 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case' " and must be given on request " 'when there is evidence supportive of the theory' "].) Here, the defense did not make such a request; therefore, the court did not err in failing to instruct on subjective provocation.

If Suarez wanted an amplifying instruction on subjective provocation, he should have requested it at trial. To the extent he now argues the trial court was further required to instruct the jury that the prosecution was required to prove, beyond a reasonable doubt, the absence of subjective provocation or heat of passion arising from subjective

People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder."

provocation, this claim is forfeited because Suarez did not request an instruction on subjective provocation in the first place. (*People v. Hart* (1999) 20 Cal.4th 546, 622 [failure to request clarifying instruction at trial forfeits claim on appeal].)

### III.    *Ineffective Assistance of Counsel as to Subjective Provocation Instruction* [*]

Suarez argues in the alternative that defense counsel was ineffective in failing to request a pinpoint instruction on subjective provocation. We disagree.

To establish constitutionally inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*People v. Haskett* (1990) 52 Cal.3d 210, 248; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–696.) An appellate court may entertain a claim of ineffective assistance of counsel on direct appeal when " 'there simply could be no satisfactory explanation' " for counsel's conduct. (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Here, Suarez cannot show that counsel's representation was objectively deficient, because the record suggests counsel could have made a reasonable tactical decision not to request a pinpoint instruction on subjective provocation. The record confirms the primary theory of defense was that Suarez acted in the heat of passion and/or on account of imperfect self-defense, and was guilty, at most, of voluntary manslaughter. In light of this strategy, counsel reasonably could have decided not to request an instruction on

----

[*]     See footnote, *ante*, page 1.

20.

subjective provocation. as the latter concept potentially could have diluted the defense theory that the offense was voluntary manslaughter, not murder.[9]

Since counsel could have had a tactical reason for acting as he did, and this reason does not appear in the record, the matter of ineffective assistance of counsel should be addressed instead in habeas proceedings, where a record of counsel's reasons can be developed. (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10; *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1; *People v. Plager* (1987) 196 Cal.App.3d 1537, 1543.)

## IV. *Instruction on Provocation in Relation to Heat of Passion Manslaughter* [*]

Suarez next challenges the standard instruction on heat of passion manslaughter, CALCRIM No. 570. Here, the trial court gave CALCRIM No. 570 on the defense's request. Suarez nonetheless argues the instruction was not a correct statement of the law to the extent it prohibited the jury from considering his youthfulness in evaluating the existence of objective provocation. Specifically, Suarez contends that "CALCRIM [No.] 570, as given here, was erroneous insofar as it was reasonably susceptible to a legally incorrect interpretation that the 'average person' **excluded** consideration of [his] youth in determining adequate provocation." We need not decide the substantive merits of this issue, because the record discloses no substantial evidence of objective or reasonable provocation, irrespective of Suarez's age; accordingly, even assuming the court erred as Suarez complains, the error was harmless under any standard of prejudice.

An intentional, unlawful homicide constitutes voluntary manslaughter when it occurs "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).) Here, the defense posited a heat of passion theory of voluntary manslaughter. Heat of passion

---

[9] For example, defense counsel argued in closing: "[W]hen [the prosecutor] was up here talking about murder, murder, murder, murder, well, yeah, the law says his murder words are being reduced [to voluntary manslaughter]."

[*] See footnote, *ante*, page 1.

occurs where a "killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)  Heat of passion encompasses an objective element—provocation—and a subjective element—passion; both prongs must be affirmatively demonstrated at trial. (*People v. Williams* (1969) 71 Cal.2d 614, 624; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1411–1412.)  Taking the provocation prong first, the requisite provocation must come from the victim; the defendant must reasonably believe the victim engaged in provocative behavior.  (*People v. Lee* (1999) 20 Cal.4th 47, 59 (plur. opn. of Baxter, J.).)  The provocative conduct can be verbal or physical, but it must be objectively and adequately provocative, i.e., it must be such as would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.  (*Ibid.*)  As for the passion prong, the defendant's reason and judgment must actually be obscured or disturbed at the time of the homicidal conduct; the passion aroused " 'need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations], other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.)

At the jury instruction conference, the judge noted that while he was inclined to give an instruction on voluntary manslaughter on an imperfect self-defense theory, he did not think an instruction for heat of passion manslaughter was warranted because there was no evidence of any provocative words or conduct by the victim.  The judge explained that, in his view, simply "wearing blue clothing in a red territory" was not "a sufficient challenge to trigger heat of passion."  The defense then specifically requested CALCRIM No. 570, the standard instruction on heat of passion manslaughter.  The court responded, "Without any evidence of words or actions."  Subsequently, after the prosecutor objected that there was no evidence of any provocative argument between Suarez and Cordero, the court crystallized the issue:  "Well, I mean, there is no evidence that there is sudden

quarrel. It's the issue of whether it's in the heat of passion that the—that the victim wearing solid blue in Sureño territory amounts to a challenge." Ultimately, the court ruled that, in an abundance of caution, it would give the instruction as requested by the defense. But, the judge pointed out, "[t]he defendant is not allowed to setup his own standard of conduct in deciding whether the provocation is sufficient, to consider whether a person of average disposition in the same situation with the same facts would have reacted with passion, so it's not the average gang member, it's the average person." As for the jury's consideration of Suarez's age in evaluating the existence of reasonably adequate provocation, defense counsel was permitted to and did argue that Suarez's age was directly relevant to the analysis; the prosecutor did not contradict defense counsel's argument to this effect.

Notwithstanding that a heat of passion manslaughter instruction was given here, the record does not disclose substantial evidence of objective provocation or heat of passion. Here, as explained above, the court gave the instruction only on defense counsel's request. Therefore, the fact that an instruction was given does not automatically signify that the instruction was warranted by the state of the evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1130 [fact that counsel requested and obtained heat of passion manslaughter instruction does not establish evidence necessitated sua sponte instructions; such instructions are often given out of abundance of caution].) Indeed, the court's comments suggested that the state of the evidence was such as did *not* warrant a sua sponte instruction.

The record supports the trial court's assessment. There was no testimony from any witness as to any provocative words or actions on the part of the victim. Similarly, there was no testimony from any witness, or other evidence, that Suarez was actually provoked into a passion by something the victim said or did. Nor was there any circumstantial evidence to support an inference of provocation sufficient to cause a reasonable person—or even a reasonable 15 year old—to be overcome by passion. In

23.

sum, there was nothing about the encounter that would have caused a reasonable person, adult or teenager, to be so inflamed as to lose reason and judgment, nor was there any evidence Suarez actually was so inflamed.

Nonetheless, Suarez argues that the trial court did not properly instruct on the lesser included offense of heat of passion manslaughter. Specifically, he argues that the standard instruction, CALCRIM No. 570, "was erroneous insofar as it was reasonably susceptible to a legally incorrect interpretation that the 'average person' **excluded** consideration of [Suarez's] youth in determining adequate provocation." We conclude that, in light of the lack of evidence of reasonable provocation irrespective of Suarez's age, the error complained of would be harmless under any standard of prejudice. (See *Middleton, supra,* 52 Cal.App.4th at p. 34.)

Suarez further argues, in the alternative, that defense counsel was ineffective for failing to request a modification to CALCRIM No. 570, or a supplemental instruction, to the effect that "youth must be considered as an objective factor in determining adequate provocation for manslaughter." We reject Suarez's ineffective assistance of counsel claim given our conclusion that Suarez was not prejudiced by the lack of such language in the manslaughter instructions given by the court.

## V.    *Alleged Prejudicial Effect of Gang Evidence on Murder Conviction* [*]

Suarez challenges the admission of evidence of his gang membership, incarcerations, and prior crimes. Suarez specifically contends the admission of this evidence was an abuse of discretion "because it was irrelevant, inadmissible under Evidence Code section 352 (more prejudicial than probative as well as cumulative[, in part because it relates] to a point not reasonably in dispute), and impermissible character evidence." We reject these contentions.[10]

---

[*]    See footnote, *ante*, page 1.

[10]    The evidence to which Suarez objects includes evidence of certain gang-related custodial contacts and incidents in juvenile hall:  (1) On February 26, 2013, when taken

We review a trial court's admission of evidence, including gang testimony, for abuse of discretion. (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193 (*Avitia*).) The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in miscarriage of justice. (*Ibid.*) "Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*Id.* at p. 192.)

In the instant matter, Suarez was charged with a murder that the prosecution contended was motivated by gang-based retaliation arising from Suarez's membership in the Norteño gang and the victim's status as a Sureño gang member. A gang-related sentencing enhancement alleging that Suarez had committed the murder for the benefit of, in association with, or at the direction of a criminal street gang (Pen. Code, § 186.22, subd. (b)), was also at issue in the case. For purposes of the gang enhancement, the People had to prove, inter alia, the existence of a criminal street gang based on the gang's

to juvenile hall, Suarez admitted he was a Norteño gang member; (2) On September 25, 2012, Suarez and several other Norteño members assaulted a "Crips/Thugs" detainee upon being taken into custody at juvenile hall; (3) On September 7, 2012, and September 22, 2012, Suarez and other Norteños assaulted some Merced Gangster Crips in juvenile hall; (4) Suarez assaulted another member of the Merced Gangster Crips in juvenile hall on September 12, 2011; (5) On September 5, 2011, Suarez and other Norteños were noted to be skipping the number "3" during exercise counts in the yard of a juvenile facility; (6) On June 11, 2010, Suarez was attacked by a Sureño in juvenile hall and a documented Norteño member assaulted the Sureño in retaliation; and (7) On May 12, 2012, Suarez admitted in completing jail booking or classification procedures that he was an active Norteño gang member.

Suarez also challenges the admission of evidence reflecting his involvement in three prior burglaries: (1) On August 17, 2011, the Dos Palos Police Department investigated a burglary involving Suarez and two other Norteño gang members; (2) On August 12, 2011, the Merced County Sheriff's Department investigated a burglary of a church involving Suarez and several other Norteño members; and (3) On June 17, 2011, the victim of a residential burglary investigated by the Merced County Sheriff's Department identified Suarez and another Norteño gang member as the burglars.

primary activities and pattern of criminal gang activity. (*Id*., subd. (f).) The People's gang expert testified that the Norteños are a criminal street gang in Merced County and that their primary activities include burglaries and other crimes. The People further had to prove the defendant acted for the benefit of, in association with, or at the direction of a criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. (*Id*., subd. (b).)

In light of the People's theory of the case, as well as the gang enhancement allegation, we reject Suarez's contention that the challenged gang evidence was irrelevant and hence inadmissible under Evidence Code section 350. Suarez argues the gang membership evidence was irrelevant, because proof of the gang enhancement did not strictly require a showing Suarez was a gang member. This argument appears disingenuous, as evidence demonstrating Suarez was a Norteño would be far more compelling, for purposes of showing he acted to benefit the Norteño gang, than the opposite scenario.

Suarez next argues the challenged evidence should have been excluded as more prejudicial than probative under Evidence Code section 352. This claim too is without merit. "Evidence Code section 352 requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative … [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*).)

Here, the court carefully conducted the appropriate balancing test under Evidence Code section 352 as to the gang-related evidence the People sought to present. The court sanitized evidence related to four gang-related shootings involving Suarez. The court found that those incidents—some of which entailed shootings of Sureños—too closely mirrored the instant offense and, unless sanitized, were inadmissible under Evidence Code section 352. Thus, as to each of these incidents, the court permitted the gang expert

26.

to testify only that Suarez had a gang-related contact with Sureños, without referencing the substantive details of the underlying incident.[11]

With respect to the other evidence of gang membership, it cannot be disputed that such evidence had the potential to be highly inflammatory. Nonetheless, here the jury was presented with a clear snapshot of the fatal encounter through eyewitness testimony, which limited the potential for prejudice arising from evidence of gang membership. Veronica was able to describe the period leading up to the murder, as well as Suarez's conduct and demeanor and, for the most part, the victim's behavior immediately preceding and during the encounter. Similarly, while Suarez correctly points out that his state of mind was a key issue in the case and gang-related evidence had the potential to color the jury's view on that issue, by the same token, this evidence was highly relevant to the prosecution's theory that Suarez acted to avenge his gang. Given this context, the evidence of Suarez's gang membership had significant probative value. We conclude the probative value of the evidence was not substantially outweighed by its potential for prejudice, nor was the evidence cumulative. In admitting the evidence but sanitizing the most prejudicial incidents, the court properly exercised its discretion.

Finally, Suarez argues the challenged evidence constituted inadmissible propensity evidence. "[G]ang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense.' " (*Avitia*, *supra*, 127 Cal.App.4th at p. 192; see Evid. Code, § 1101, subd. (a) [evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act].) However, gang-related evidence in the

---

**11** Essentially, the court sanitized evidence concerning a number of offense reports: a January 21, 2013, offense report concerning shots fired; a December 18, 2012, offense report noting Suarez shot several rounds at a Sureño in a drive-by incident; an April 10, 2012, offense report noting Suarez brandished a firearm at a Sureño; and a March 26, 2010, offense report noting Suarez shot the reporting party with an air rifle.

form of prior, uncharged acts is admissible when relevant to establish the defendant's motive, intent, or another fact related to the charged offenses other than criminal propensity, as long as its probative value outweighs its prejudicial effect and it is not cumulative. (Evid. Code, § 1101, subd. (b).) Suarez correctly points out that the evidence of prior, uncharged acts admitted here had the potential to be extremely prejudicial but, conversely, it was highly relevant to establish a gang-related motive for the murder, as well as to show, for purposes of the gang enhancement, that Suarez acted for the benefit of, in association with, or at the direction of a criminal street gang. Furthermore, the "potential for prejudice [was] decreased [because the] testimony describing the defendant's uncharged acts [was] no stronger or more inflammatory than the testimony concerning the charged offense." (*Tran, supra,* 51 Cal.4th at p. 1047.) We cannot say the trial court abused its discretion in admitting this evidence.

## VI. Cumulative Error[*]

Suarez contends there was cumulative error. A series of errors, though independently harmless, may in some circumstances rise to the level of reversible and prejudicial error. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Hill* (1998) 17 Cal.4th 800, 844.) That is not the case here as there are either no errors or any error was not prejudicial.

## VII. Cruel and Unusual Punishment[*]

Suarez was born on June 7, 1998, and had just turned 15 years old when he committed the instant offense. He argues that his sentence of two consecutive terms of 25 years to life or, in aggregate, 50 years to life, which was statutorily mandated (Pen. Code, §§ 190, subd. (a), 12022.53, subd. (d); see *Franklin*, *supra*, 63 Cal.4th at p. 268; Pen. Code, § 3046, subds. (a)(2) & (b)), amounts to a de facto sentence of life without the possibility of parole (LWOP) and is unconstitutional under the United States Supreme

---

[*]     See footnote, *ante*, page 1.

28.

Court's decision in *Miller*, *supra*, 567 U.S. 460. *Miller* held that mandatory LWOP sentences for juveniles convicted of homicide, imposed without judicial consideration of their youth and its relevance for sentencing, violate the Eighth Amendment's ban on cruel and unusual punishment. (*Miller*, at pp. 479–480.)[12]

Our Supreme Court recently resolved, in *Franklin*, *supra*, 63 Cal.4th 261, precisely the issue Suarez raises here; indeed *Franklin* is on all fours with the instant case. In that case, the 16-year-old defendant, Franklin, argued that his aggregate term of 50 years to life on a first degree murder conviction and a personal firearm-discharge enhancement was the functional equivalent of an LWOP sentence and, therefore, subject to *Miller's* prohibition against mandatory LWOP sentences for juveniles convicted of homicide. (*Franklin*, at p. 268.) While *Franklin* found that *Miller* applied to sentences that were the functional equivalent of LWOP sentences for juveniles convicted of homicide, the court concluded Franklin's Eighth Amendment claim was mooted by newly enacted Penal Code section 3051, which required that an offender in Franklin's position receive a parole hearing during his 25th year of incarceration. (*Franklin*, at pp. 276, 280.) Accordingly, under *Franklin*, Suarez's Eighth Amendment claim is moot.[13]

---

[12]    The People argue Suarez forfeited this issue because his attorney did not object to the sentence on Eighth Amendment grounds. Ordinarily, a claim of cruel and unusual punishment is "fact specific"; as a result, it is forfeited if not raised in the trial court. (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; accord, *People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.) Here, however, Suarez relies on *Miller*'s rule squarely prohibiting a mandatory sentence of life without parole for a juvenile offender. Thus, his claim implicates a pure question of law presented on undisputed facts. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1368.) This scenario constitutes an exception to the general forfeiture rule; therefore, we may consider his claim for the first time on appeal. (*People v. Runyan* (2012) 54 Cal.4th 849, 859, fn. 3; *People v. Hines* (1997) 15 Cal.4th 997, 1061.)

[13]    Suarez recently filed a letter brief with this court, conceding that, pursuant to Penal Code section 3051, subdivision (b)(3), he "will be eligible for a 'youth offender parole hearing' during the 25th year of his sentence."

In *Franklin*, the court remanded the matter to give Franklin an opportunity to make an adequate record for purposes of the future youth offender parole hearing under Penal Code section 3051, unless the trial court determined he already had sufficient opportunity to do so. (*Franklin*, *supra*, 63 Cal.4th at pp. 269, 284.) The record before us indicates Suarez did not have sufficient opportunity to develop the type of record contemplated in *Franklin* at his sentencing, especially as counsel did not raise a cruel and unusual punishment claim under *Miller* and essentially made no argument in view of the statutorily mandated sentence. Furthermore, *Franklin's* guidelines as to the procedures for making an adequate record had not yet been explicated, therefore neither the prosecutor nor defense counsel knew the scope of these procedures or of the record-making permitted thereunder. (See *Perez*, *supra*, 3 Cal.App.5th at p. 619.) Accordingly, we order a limited remand for both parties "to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board [of Parole Hearings], years later, may properly discharge its obligation to 'give great weight to' youth-related factors [citation] in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime." (*Franklin*, at p. 284.)

### VIII.  Proposition 57

Suarez contends the Act applies retroactively to cases, such as his, that were filed directly in criminal (adult) court but that are not yet final. His claim is based, in large part, on the California Supreme Court's holding in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*) and its reasoning in *Franklin*, *supra*, 63 Cal.4th 261. He also says failure to remand his case for a fitness hearing conducted under the provisions of Proposition 57 would deprive him of equal protection and be prejudicial.

### *Procedural Background and Proposition 57*

Historically, before a minor could be tried in criminal (adult) court, California required a finding the minor was unfit to be dealt with under the juvenile court law. (See, e.g., *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1493 (*Juan G.*); *People v.*

*Cardona* (2009) 177 Cal.App.4th 516, 524.)  Although, prior to 1999, there was no provision for the direct filing (mandatory or discretionary) of charges against juveniles in criminal court (*Juan G.*, at p. 1493), a presumption of unfitness for minors, aged 16 years old or older and charged with specified offenses, was added to the Welfare and Institutions Code in 1979, and extended, in 1994, to minors between the ages of 14 and 16 who were alleged to have committed certain forms of murder (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 680–681, fn. 1).

In 1999, the Legislature added subdivision (b) to section 602, mandating the direct filing in adult court of criminal cases against minors 16 years of age or older under specified circumstances.  (*Juan G.*, *supra*, 209 Cal.App.4th at p. 1493.)  In 2000, voters approved Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998. In pertinent part, it "confer[red] on prosecutors the discretion to bring specified charges against certain minors directly in criminal court, without a prior adjudication by the juvenile court that the minor [was] unfit for a disposition under the juvenile court law." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 545 (*Manduley*); see generally *id.* at pp. 548–550.)  Proposition 21 also decreased, to 14, the minimum age for mandatory criminal prosecutions.  (*Manduley*, at p. 550.)

John Cordero was killed on June 23, 2013.  Suarez was born June 7, 1998, making him 15 years old at the time of the crime of which he was convicted.  He was charged directly in criminal court, convicted on July 16, 2014, and sentenced on September 26, 2014.  His notice of appeal was filed on or about September 30, 2014.

On November 8, 2016, while Suarez's appeal was pending, voters enacted Proposition 57.  It went into effect the next day.  (Cal. Const., art. II, § 10, subd. (a).) Insofar as we are concerned, the Act eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court.  It also removed the

presumption of unfitness that attached to the alleged commission of certain offenses.[14]

The purpose of the portions of Proposition 57 that deal with juvenile offenders is to undo Proposition 21. (See generally *People v. Marquez* (2017) 11 Cal.App.5th 816, 821, review granted July 26, 2017, S242660 (*Marquez*).) The Act's stated purposes, contained in uncodified section 2 thereof, are to "[p]rotect and enhance public safety"; "[s]ave money by reducing wasteful spending on prison"; "[p]revent federal courts from indiscriminately releasing prisoners"; "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles"; and [r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141.)[15]

---

**14** Section 602 now states: "Except as provided in Section 707, any person who is under 18 years of age when he or she violates any law of this state …, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

Section 707 now provides, in pertinent part: "(a)(1) In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, … the district attorney … may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction. The motion must be made prior to the attachment of jeopardy. Upon such motion, the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor.… [¶] (2) Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. In making its decision, the court shall consider [certain specified] criteria .…" Subdivision (b) of section 707 extends subdivision (a) of the statute to any minor who allegedly committed a specified offense when he or she was 14 or 15 years of age. Murder is one such offense. (§ 707, subd. (b)(1).)

**15** The Voter Information Guide is available at <http://www.sos.ca.gov/elections/voting-resources/voter-information-guides/> [as of Dec. 4, 2017].

*Analysis*

There can be no doubt that, had Suarez committed his offense after Proposition 57 went into effect, he would have been entitled to a fitness hearing—with no presumption of unfitness—before his case could be transferred to criminal (adult) court for prosecution. The question we confront is whether Proposition 57 applies to juvenile offenders who, like Suarez, were charged, tried, convicted, and sentenced before the Act's effective date, but whose cases are not yet final on appeal. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 935 [for purpose of determining retroactive application of amendment to criminal statute, judgment is not final until time for petitioning for writ of certiorari in United States Supreme Court has passed].)[16] This is a purely legal question we analyze de novo. (See *People v. Arroyo* (2016) 62 Cal.4th 589, 593 (*Arroyo*).)[17]

Suarez says Proposition 57 applies retroactively to direct file cases that are not yet final. We disagree.

In ascertaining whether a statute should be applied retroactively, the intent of the electorate, or the Legislature, "is the 'paramount' consideration." (*People v. Nasalga* (1996) 12 Cal.4th 784, 792 (plur. opn. of Werdegar, J.); see *People v. Conley* (2016) 63 Cal.4th 646, 656.) " ' "In interpreting a voter initiative" ' such as Proposition [57], ' "we

---

[16] We are not here faced with, and express no opinion concerning, the situation of a minor who was charged in adult court but not yet tried at the time the Act went into effect. (See *People v. Superior Court (Lara)* (2017) 9 Cal.App.5th 753, 758, 773–778, review granted May 17, 2017, S241231; see also *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288 (*Tapia*).)

[17] This question is pending review before the state Supreme Court in numerous cases, including *People v. Superior Court (Walker)* (2017) 12 Cal.App.5th 687, review granted September 13, 2017, S243072; *Marquez, supra*, 11 Cal.App.5th 816, rev.gr.; *People v. Vela* (2017) 11 Cal.App.5th 68, review granted July 12, 2017, S242298; *People v. Mendoza* (2017) 10 Cal.App.5th 327, review granted July 12, 2017, S241647 (*Mendoza*); and *People v. Cervantes* (2017) 9 Cal.App.5th 569, review granted May 17, 2017, S241323.

33.

apply the same principles that govern statutory construction. [Citation.] Thus, [1] 'we turn first to the language of the statute, giving the words their ordinary meaning.' [Citation.] [2] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. [Citation.] [3] When the language is ambiguous, 'we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet.' " ' [Citation.] 'In other words, our "task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent." ' [Citation.]" (*Arroyo*, *supra*, 62 Cal.4th at p. 593.)

"It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise. [Citations.]" (*Tapia*, *supra*, 53 Cal.3d at p. 287.) While the Welfare and Institutions Code does not contain a statutory codification of this principle (cf., e.g., Code Civ. Proc., § 3, Pen. Code, § 3), the California Supreme Court has made clear such statutory language " 'does no more than codify a general rule of construction, applicable as well to statutes containing no such provision. [Citations.]' [Citation.]" (*Stenger v. Anderson* (1967) 66 Cal.2d 970, 977, fn. 13.)

The provisions of Proposition 57 affecting only juvenile offenders contain no express statement regarding retroactivity. Suarez seeks support for his claim of retroactive application in the Act's purportedly ameliorative stated purpose and intent, set out *ante*; uncodified section 5 of the Act, which says the Act "shall be broadly construed to accomplish its purposes" (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 57, § 5, p. 145); and uncodified section 9 of the Act, which says the Act "shall be liberally construed to effectuate its purposes" (Voter Information Guide, Gen. Elec., *supra*, text of Prop. 57, § 9, p. 146). Our Supreme Court, however, has "been cautious not to infer the voters' or the Legislature's intent on the subject of prospective versus retrospective operation from 'vague phrases' [citation] and 'broad, general language'

34.

[citation] in statutes, initiative measures and ballot pamphlets." (*Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 229–230.) "Accordingly, we will not attempt to infer from the ambiguous general language of Proposition [57] whether the voters intended the measure to apply to … cases [that are not yet final]. Instead we will employ the ordinary presumptions and rules of statutory construction commonly used to decide such matters when a statute is silent." (*Id.* at p. 230.)

" '[A] statute that is ambiguous with respect to retroactive application is construed … to be unambiguously prospective. [Citations.]' " (*Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841, quoting, inter alia, *I.N.S. v. St. Cyr* (2001) 533 U.S. 289, 320–321, fn. 45.) Suarez argues, however, that Proposition 57 falls within the exception to this general principle carved out by *Estrada*, *supra*, 63 Cal.2d 740.

*Estrada* dealt with a situation in which, at the time of the petitioner's offense (escape without force or violence), the applicable statutes mandated a sentence of at least one year's imprisonment, to commence from the time the prisoner would have been discharged otherwise, with no grant of parole until service of at least two calendar years from the date of the escapee's return to prison after conviction. After the petitioner committed the crime, but before his conviction and sentence, the statutes were amended to provide for a sentence of six months to five years in prison, with no minimum date for parole eligibility. (*Estrada*, *supra*, 63 Cal.2d at pp. 743–744.)[18] The California Supreme Court stated:

> "The problem, of course, is one of trying to ascertain the legislative intent—did the Legislature intend the old or new statute to apply? Had the Legislature expressly stated which statute should apply, its determination, either way, would have been legal and constitutional. It has not done so.

---

[18]    "Although parole constitutes a distinct phase from the underlying prison sentence, a period of parole following a prison term has generally been acknowledged as a form of punishment." (*People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

We must, therefore, attempt to determine the legislative intent from other factors.

"There is one consideration of paramount importance. It leads inevitably to the conclusion that the Legislature must have intended, and by necessary implication, provided, that the amendatory statute should prevail. When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at pp. 744–745.)

With respect to Penal Code section 3, the court stated: "That section simply embodies the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively. That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent. It is to be applied only after, considering all pertinent factors, it is determined that it is impossible to ascertain the legislative intent. In the instant case there are … other factors that indicate the Legislature must have intended that the amendatory statute should operate in all cases not reduced to final judgment at the time of its passage." (*Estrada*, *supra*, 63 Cal.2d at p. 746.)

We conclude *Estrada* does not require that the provisions of Proposition 57 be applied retroactively to Suarez's case. Although *Estrada* has been broadly applied in the past (see, e.g., *People v. Francis* (1969) 71 Cal.2d 66, 75–76 (*Francis*) [applying *Estrada*

to statutory amendment vesting in trial court discretion to impose either same penalty as under former law or lesser penalty]), the California Supreme Court has since made it clear *Estrada* "supports an important, *contextually specific* qualification to the ordinary presumption that statutes operate prospectively:  When the Legislature has amended a statute to reduce the punishment *for a particular criminal offense*, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.  [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, italics added, fn. omitted (*Brown*).)

The state's high court noted the "limited role *Estrada* properly plays in our jurisprudence of prospective versus retrospective operation" (*Brown*, *supra*, 54 Cal.4th at p. 324), and found *Estrada*'s statement about the rule of construction codified in Penal Code section 3 not being a "straitjacket" (*Estrada*, *supra*, 63 Cal.2d at p. 746), if applied broadly and literally, would "endanger the default rule of prospective operation" (*Brown*, at p. 324).  The court concluded:  "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in [Penal Code] section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment *for a particular criminal offense* is intended to apply to all nonfinal judgments. [Citation.]"  (*Id*. at p. 324, italics added.)  The court rejected the argument *Estrada* should be understood to apply to any statute that reduces punishment in any manner, noting "the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' [citation]."  (*Brown*, at p. 325, original italics.)

*Brown* concerned the application of a change in the rate at which prisoners in local custody could earn conduct credits (*Brown*, *supra*, 54 Cal.4th at pp. 317–318), a very different situation than we confront here.  Nevertheless, we cannot just blithely write off, on that ground, a pronouncement by our state's highest court that limits the holding in

one of that court's prior cases. That the state Supreme Court did not intend this limitation to apply only in the circumstances presented in *Brown* is clearly demonstrated by the fact it cited to a discussion of the default rule of prospective application, and rejection of a broad interpretation of *Estrada*, contained in *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1207–1209, a civil case. (*Brown*, at pp. 324–325.) The Supreme Court's application of the limitation on *Estrada* in two such disparate scenarios strongly signals its intent that said limitation should be broadly applied. This is especially so when we take into account that court's more recent reference to *Brown* as "acknowledging the continuing viability of the *Estrada* rule, [but] emphasiz[ing] its narrowness." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1196, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

We recognize significant differences exist between juvenile and adult offender laws, and that "[t]he former seeks to rehabilitate, while the latter seeks to punish." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.) We also recognize "the certification of a juvenile offender to an adult court has been … characterized as 'the worst punishment the juvenile system is empowered to inflict.' [Citation.]" (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810.) Proposition 57 has the potential to reduce the range of permissible punishment—including that applicable to the offense of which Suarez was convicted—for a class of offenders. Nevertheless, no provision of Proposition 57 mitigates the penalty for a particular criminal offense. Accordingly, *Estrada* does not overcome the strong presumption of prospective-only application.[19]

---

[19] In *Tapia*, *supra*, 53 Cal.3d 282, the California Supreme Court addressed application of the provisions of Proposition 115. In pertinent part, it held that provisions adding intent requirements to certain special circumstances permissibly could be applied to *trials* of crimes committed before the proposition's operative date, because, although they changed the legal consequences of a defendant's criminal conduct, they did so in a way that benefited defendants. (*Tapia*, at pp. 300–301.) The *Tapia* opinion says nothing about application of the new provisions to cases in which trial was already held.

As previously noted, the portions of Proposition 57 applicable only to juvenile offenders contain no express retroactivity provision. By contrast, the Act expressly renders the provisions relating to eligibility for parole consideration retroactive by making them applicable to "[a]ny person convicted … and sentenced." (Cal. Const., art. I, § 32, subd. (a)(1); see *Franklin*, *supra*, 63 Cal.4th at p. 278 [discussing retroactivity of youth offender parole hearings under Pen. Code, § 3051].) Additionally, section 707, subdivision (a)(1), as amended by the Act, mandates that any motion to transfer the minor from juvenile court to criminal court "*must* be made *prior to the attachment of jeopardy*." (Italics added.)

"The voters are presumed to have been aware of existing law at the time an initiative was enacted. [Citations.]" (*Juan G.*, *supra*, 209 Cal.App.4th at p. 1494.) We generally also assume voters considered the entire text of a proposal submitted to them for enactment. (See *People v. Valencia* (2017) 3 Cal.5th 347, 369.) This being the case, logic dictates that had voters intended the juvenile offender provisions of Proposition 57 to apply to such offenders who were already tried, convicted, and sentenced, the enactment would have included an express provision to that effect, as do the parole eligibility portions of the Act.

When interpreting a legislative enactment, " '[w]e must … avoid a construction that would produce absurd consequences, which we presume the Legislature [or voters] did not intend. [Citations.]' [Citation.]" (*In re Greg F.* (2012) 55 Cal.4th 393, 406; see *People v. Union Pacific Railroad Co.* (2006) 141 Cal.App.4th 1228, 1257, fn. 5.) To hold Proposition 57 applies retroactively to defendants who have been convicted and sentenced, but whose judgments are not yet final, would mean an offender who was tried and convicted by a jury of special circumstance murder upon proof beyond a reasonable doubt, and sentenced to life without the possibility of parole by a court that carefully considered whether to impose a lesser term of 25 years to life as permitted by Penal Code section 190.5, subdivision (b), would be given the opportunity of being released within a

39.

matter of a few years (see, e.g. §§ 607, 1769, 1771). This is so even though the life-without-parole sentence comported with the Eighth Amendment to the United States Constitution, as construed in *Miller*, *supra*, 567 U.S. 460 and *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*). It is difficult to imagine a more absurd result, or that voters intended for such an offender to be returned to society within such a short time.

Suarez argues, however, that the California Supreme Court's decision in *Franklin*, *supra*, 63 Cal.4th 261, demonstrates Proposition 57 should be applied retroactively. We disagree.

In *Franklin*, the California Supreme Court determined Penal Code section 3051, the youth offender parole statute, applies retroactively. (*Franklin*, *supra*, 63 Cal.4th at p. 278.) The court reasoned: "The statutory text makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to all eligible youth offenders regardless of the date of conviction. [Penal Code s]ection 3051, subdivision (b) makes eligible all persons 'convicted of a controlling offense that was committed before the person had attained 23 years of age.' In addition, [Penal Code] section 3051, subdivision (i) says: 'The board shall complete all youth offender parole hearings for individuals who became entitled to have their parole suitability considered at a youth offender parole hearing on the effective date of [this section] by July 1, 2015.' This provision would be meaningless if the statute did not apply to juvenile offenders already sentenced at the time of enactment." (*Ibid.*)

The provisions of the Act that apply to juveniles make no reference to persons already convicted or sentenced. To the contrary, while section 602, as amended by Proposition 57, places "any" juvenile offender within the jurisdiction of the juvenile court except as provided in section 707, section 707, subdivision (a)(1), as amended, does not permit a motion to transfer the juvenile to criminal court to be made at any time, but rather mandates it be made before jeopardy attaches. The clear and only reasonable

40.

implication is that the resulting fitness hearing must also take place before such time. Jeopardy manifestly attaches prior to conviction and sentencing.

Moreover, as *Franklin* observes, the Legislature enacted Penal Code section 3051 and related provisions "explicitly to bring juvenile sentencing into conformity with" the *Miller* line of precedents. (*Franklin*, *supra*, 63 Cal.4th at p. 277.) *Miller* itself is fully retroactive. (*Montgomery*, *supra*, 577 U.S. at pp. ___–___ [136 S.Ct. at pp. 733–734].) Even if we assume, as Suarez argues, "[c]hildren are different, and Proposition 57 is one of many new laws intended to recognize that juveniles are less culpable and have a greater potential for reform than their adult counterparts," this does not mean it should be applied retroactively. *Miller*, *Montgomery*, and their predecessor United States Supreme Court opinions simply do not speak to the subject of the court system in which a juvenile is to be tried.

In terms of the intent of the legislative body enacting the law, there is a significant difference between affording an opportunity for parole after 15 or more years of incarceration (Pen. Code, § 3051, subd. (b)), with no additional resentencing procedure required (*Franklin*, *supra*, 63 Cal.4th at pp. 278–279), and essentially returning to square one an offender who has already been tried, convicted, and sentenced, and having the potential that offender's release will be required in fewer than 10 years.

In short, *Franklin* does not assist Suarez.

Suarez also argues that denying him the benefit of Proposition 57 would violate equal protection. We conclude his claim lacks merit.

" ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' " [Citation.] 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but

41.

'whether they are similarly situated for purposes of the law challenged.' [Citation.]" (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253; see *People v. Wutzke* (2002) 28 Cal.4th 923, 943–944.)

We are not convinced someone like Suarez, who was tried, convicted, and sentenced before the Act went into effect, is similarly situated, for purposes of the law, as someone not yet charged (or at least not yet tried) at that time. " '[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' [Citation.]" (*People v. Floyd* (2003) 31 Cal.4th 179, 191 (*Floyd*); see *Estrada*, *supra*, 63 Cal.2d at p. 744 [Legislature's determination whether old or new statute should apply, "either way, would [be] legal and constitutional"].)

Were we to find Suarez is indeed similarly situated to those not yet tried when the Act went into effect, we would conclude the classification " 'is "rationally related to a legitimate governmental purpose." ' [Citation.] 'A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced should be treated alike." ' [Citation.]" (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1325.)

Use of the rational basis test is appropriate "[w]here … a disputed statutory disparity implicates no suspect class or fundamental right." (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).) Suarez argues that "[t]he constitutionality of the restraint on [Suarez's] liberty must … pass the test of strict scrutiny." (See generally *In re Olivas* (1976) 17 Cal.3d 236, 251; *Mendoza*, *supra*, 10 Cal.App.5th at pp. 350–351, rev.gr.)

Suarez's restraint is not unconstitutional. His prosecution, conviction, and sentencing in criminal court were proper under the laws in place when those events occurred. (See *Manduley*, *supra*, 27 Cal.4th at pp. 567–569.) He had no constitutional right to be adjudicated in the juvenile court system or to be presumed fit to remain in that

42.

system.  (*Hicks v. Superior Court* (1995) 36 Cal.App.4th 1649, 1658.)  Finally, to the extent Suarez claims "the question involves the possible retroactive application of a more beneficial sentencing scheme, [he] has no fundamental liberty interest at stake."  (*People v. Lynch* (2012) 209 Cal.App.4th 353, 359.)

In enacting Proposition 57, voters reasonably could have concluded that applying the Act prospectively was rationally related to the legitimate governmental purpose of " 'assur[ing] that penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment was written.'  [Citations.]"  (*Floyd*, *supra*, 31 Cal.4th at p. 188.)  The fact penal laws might not maintain their complete deterrent effect in all cases should (as seems likely) Proposition 57 apply to juvenile offenders who committed their crimes before, but were not yet tried when, the Act went into effect, is immaterial. " '[W]hen conducting rational basis review, we must accept any gross generalizations and rough accommodations that the [voters] seem[] to have made.'  [Citation.]  'A classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citations], or 'because it may be "to some extent both underinclusive and overinclusive" ' [citations]."  (*Johnson*, *supra*, 60 Cal.4th at p. 887.)

We find no equal protection violation.  Accordingly, we need not address Suarez's claim that the purported equal protection violation occasioned by depriving him of a fitness hearing pursuant to Proposition 57 would be prejudicial, nor need we determine the appropriate standard of prejudice.  We note, however, that "[w]hether or not the [electorate] intended the [enactment] to be retroactive to cases not final before the effective date [thereof] obviously cannot be decided on the basis of the particular facts of this or any other individual case."  (*Francis*, *supra*, 71 Cal.2d at pp. 76–77.)

### IX.  Senate Bill No. 620[*]

At the time Suarez was charged, convicted, and sentenced, subdivision (h) of Penal Code section 12022.53 provided:  "Notwithstanding [Penal Code] Section 1385 or any other provision of law, the court shall not strike an allegation under this section or a finding bringing a person within the provisions of this section."[20]  Thus, the trial court here was required to, and did, enhance Suarez's sentence by 25 years to life, pursuant to Penal Code section 12022.53, subdivision (d).[21]

After Suarez was sentenced, but while the case was still pending on appeal, the Legislature enacted Senate Bill No. 620.  As of January 1, 2018, subdivision (c) of Penal Code section 12022.5 and subdivision (h) of Penal Code section 12022.53 will provide:  "The court may, in the interest of justice pursuant to [Penal Code] Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."

Relying primarily on *Francis*, *supra*, 71 Cal.2d at pages 75–76, the Attorney General concedes the foregoing amendments apply retroactively to Suarez's case, as it will not yet be final when the amendments go into effect (see *People v. Vieira* (2005) 35 Cal.4th 264, 306).  We accept the concession without further analysis, and turn to the Attorney General's claim remand is not appropriate because no reasonable court would exercise its discretion to strike Suarez's firearm enhancements.

---

[*]      See footnote, *ante*, page 1.

[20]      Subdivision (c) of Penal Code section 12022.5 contained the identical provision.

[21]      The trial court should also have imposed and stayed the Penal Code section 12022.5 enhancement alleged and found true by the jury.  (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1122.)  Upon remand, the court must exercise its discretion with regard to this enhancement.

With this, we do not agree. Suarez was 15 years old at the time of his offense. We are affording him a hearing under *Franklin*, and do not know what information might be presented to the trial court at that hearing. While we do not discount the fact Suarez murdered another 15-year-old boy, we cannot say, as a matter of law, that the trial court would abuse its discretion if it were to strike either or both of the firearm enhancements. Nor can we say, from the court's comments at sentencing, that it necessarily would have imposed either enhancement even if it could have exercised its discretion not to do so (cf. *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896) or that information presented at the *Franklin* hearing will have no bearing on its decision in this regard. Accordingly, we will remand the matter in order for the trial court to exercise its discretion, pursuant to Penal Code sections 12022.5, subdivision (c) and 12022.53, subdivision (h), as to both firearm enhancements.[22]

---

[22] We recognize the amendments to Penal Code sections 12022.5 and 12022.53 enacted pursuant to Senate Bill No. 620 will not yet be in effect at the time our opinion in this case is filed. Nevertheless, because the filing of Suarez's notice of appeal divested the trial court of jurisdiction over anything affecting the judgment until issuance of the remittitur (*People v. Superior Court (Gregory)* (2005) 129 Cal.App.4th 324, 329), the trial court will be unable to act on our remand order until remittitur issues. Remittitur in this case will not issue until after January 1, 2018, the effective date of the amendments.

## *DISPOSITION*

The judgment is affirmed. The matter is remanded to the trial court, at such time as remittitur issues, for the limited purposes of (1) allowing both parties to make an accurate record of Suarez's characteristics and circumstances at the time of the offense, that will be relevant to the parole authority as it fulfills its statutory obligations under Penal Code sections 3051 and 4801, subdivision (c); (2) exercising its discretion under Penal Code sections 12022.5, subdivision (c) and 12022.53, subdivision (h), as amended by Statutes 2017-2018, chapter 682, Senate Bill No. 620, effective January 1, 2018; and (3) if appropriate following exercise of that discretion, resentencing Suarez accordingly.

_____
HILL, P.J.

I CONCUR:


_____
BLACK, J.[†]

---

[†] Judge of the Superior Court of Fresno County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

46.

**Smith, J., Concurring and Dissenting**

I concur with the majority in sections I. through VII. and IX., which comprise the unpublished portion of this opinion. I respectfully dissent from the majority's decision that Proposition 57 applies prospectively only and does not extend to cases such as Suarez's, which were pending final judgment on its effective date. Although there is a general presumption that new laws apply prospectively, *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287, I conclude that Proposition 57 is subject to the exception to that presumption articulated in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).

Specifically, *Estrada* held: "When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted (*Brown*).) *Brown* explained that *Estrada* "articulate[d] the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, *supra*, at p. 324; *People v. Conley* (2016) 63 Cal.4th 646, 656 (*Conley*) [*Estrada* "held that new laws that reduce the punishment for a crime are presumptively to be applied to defendants whose judgments are not yet final"].)

*Estrada*'s rationale is based on the principle that, "'[o]rdinarily, when an amendment lessens the punishment for a crime, one may reasonably infer the Legislature has determined imposition of a lesser punishment on offenders thereafter will sufficiently serve the public interest.'" (*People v. Nasalga* (1996) 12 Cal.4th 784, 791 (plur. opn. of Werdegar, J.) (*Nasalga*).) *Estrada* explained: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should

apply to every case to which it constitutionally could apply…. [T]o hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at p. 745; see *Conley*, *supra*, 63 Cal.4th at p. 656 ["when the Legislature determines that a lesser punishment suffices for a criminal act, there is ordinarily no reason to continue imposing the more severe penalty beyond simply "'satisfy[ing] a desire for vengeance"'"].) In sum, "*Estrada* stands for the proposition that, 'where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.'" (*Nasalga*, *supra*, 12 Cal.4th at p. 792.)

The majority contends that any finding that Proposition 57 has retroactive application is foreclosed by *Brown*, notwithstanding the fact that *Brown* addressed a very different type of statute. *Brown* appeared to emphasize that the *Estrada* rule applies only when an amendatory statute reduces the penalty *for a particular crime.* (*Brown*, *supra*, 54 Cal.4th at p. 324.) The majority reasons that because Proposition 57 does not directly reduce the penalty for any particular crime, it is not retroactive under *Estrada* and *Brown*. *Brown*, however, considered the question whether a statute temporarily (i.e., for just an eight-month period) increasing good behavior credits for prisoners *after* sentencing, amounted to a reduction in punishment under *Estrada.* (*Brown*, *supra*, 54 Cal.4th at pp. 317, 323-324.) The statute at issue in *Brown* had nothing to do with the punishment or actual sentence facing a defendant for committing a crime. (*Id*. at p. 325, italics added ["Instead of addressing *punishment for past criminal conduct*, the statute addresses *future conduct* in a custodial setting by providing increased incentives for good behavior."].) Indeed, the statute was enacted as a temporary response to a state "fiscal crisis," and in no way reflected a legislative judgment that certain offenses were erstwhile punished too severely. (*Id.* at p. 325 [a statute increasing conduct credits for good behavior after

2

imposition of sentence "does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent"].)

Proposition 57, on the contrary, expressly aims to facilitate rehabilitative dispositions for minors, based on past criminal conduct, with respect to a limited subset of the most serious crimes (i.e., the crimes for which minors are subject to prosecution in adult criminal court). (See Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 2, p. 141[1] [Proposition 57 was intended to "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles" by "[r]equir[ing] a judge, not a prosecutor, to decide whether juveniles should be tried in adult court."]; see *id*., argument in favor of Prop. 57, p. 58 ["Prop. 57 focuses on evidence-based rehabilitation" by allowing "a judge to decide whether or not a minor should be prosecuted as an adult"].) In order to achieve its stated goal of facilitating rehabilitation, Proposition 57, abolishes the prosecution's ability directly to file criminal charges against minors in adult court, and erases any presumption of unfitness of a minor for purposes of juvenile court jurisdiction over his or her matter. (See, e.g., *People v. Superior Court* (*Walker*) (2017) 12 Cal.App.5th 687, 696, review granted Sept. 13, 2017, S243072.) All cases against minors are now required to be filed in juvenile court and, in order to move the case to adult court, the prosecution must bring a transfer motion, whereby it, as the proponent of the motion, shoulders the burden of showing the minor is unfit for the jurisdiction of the juvenile court. (Welf. & Inst. Code, § 707, subd. (a)(1) & (2); Evid. Code, §§ 500, 550.)

Under Proposition 57, it undeniably is harder to prosecute minors in adult court. It follows that Proposition 57 militates against imposition of the maximum punishment for

---

[1]     The Voter Information Guide is available at <http://www.sos.ca.gov/elections/voting-resources/voter-information-guides/> [as of Dec. 4, 2017].

3

the underlying subset of crimes for which minors can be prosecuted in adult court.  (See *People v. Pineda* (2017) 14 Cal.App.5th 469, 482, fn. 9 (*Pineda*) [Proposition 57 provides for "reductions in punishment for a host of penal statues without need of going to the trouble of enumerating them all"].)  Our Supreme Court has recognized, "[transferring] a juvenile offender to an adult court has been accurately characterized as 'the *worst punishment* the juvenile system is empowered to inflict.'"  (*Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 810, italics added.)[2]  The fact that Proposition 57 makes it more difficult to prosecute minors for specific crimes in adult court, reflects a determination by the voters that minors committing these crimes were, in some instances, punished too severely.  (See *Pineda*, *supra*, at p. 483, italics added ["the voters … determined criminal punishment for juvenile offenders may be too severe in some cases, namely, those where a judge *declines* to order the transfer of an offender to a court of criminal jurisdiction—an adjudicatory forum in which there is a greater focus on punishment instead of rehabilitation and greater latitude to impose substantially longer custodial sentences"].)  The voters' underlying determination that some minors were erstwhile punished too severely, leads to the "inevitable inference" that the voters intended to extend the opportunity to obtain a rehabilitative disposition under Proposition 57 as broadly as possible.  (*Estrada*, *supra,* 63 Cal.2d at p. 745; see *Conley, supra*, 63 Cal.4th at p. 656 [the *Estrada* rule creates a "presumption about legislative intent" with regard to the retroactivity of the amendment at issue].)

Furthermore, the voters approved Proposition 57 in the midst of a "sea change" in "penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders."  (*People v. Vela* (2017) 11 Cal.App.5th 68, 75, review granted Jul. 12, 2017, S242298 (*Vela*).)  Courts and legislatures have acted decisively, in recent years, to limit

---

**2**    See *People v. Macias* (1997) 16 Cal.4th 739, 750; *Marcus W. v. Superior Court* (2002) 98 Cal.App.4th 36, 41.

4

application of the harshest punishments to minors.  (See, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67 [barring LWOP sentences for minors convicted of nonhomicide offenses]; *Miller v. Alabama* (2012) 567 U.S. 460 [barring mandatory LWOP sentences for minors convicted of homicide offenses and requiring consideration of youth-related factors as mitigation at sentencing]; Sen. Bill No. 260 (2013-2014 Reg. Sess.) adding § 3051 to the Penal Code [§ 3051 recognizes the "diminished culpability of juveniles" and provides for mandatory "youth offender parole hearings" for eligible juvenile defendants].)  The fact that Proposition 57 was enacted at a time of increased recognition of the "[diminished] culpability and [unique] rehabilitation possibilities" of minors, supports the inference that the voters had determined that the specific crimes at issue were sometimes punished too severely in the case of minors.  (*Vela*, *supra*, at p. 75.)

In light of Proposition 57's emphasis on rehabilitative dispositions for minors and its potential ameliorative effects on punishment for past criminal conduct, it warrants application of the *Estrada* exception, whereas the statute at issue in *Brown*, correctly, did not.[3]  (See *People v. Francis* (1969) 71 Cal.2d 66, 79 [a *potentially* favorable amendment, in terms of the discretionary punishment faced by a defendant, is subject to the *Estrada* rule]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 69-70 [accord].)  I therefore disagree with the majority's view that Proposition 57 is inapplicable to cases that were pending final judgment on its effective date.  As in *Vela*, I would conditionally reverse the instant judgment in order to permit the juvenile court to conduct a fitness hearing as mandated by Proposition 57.  Were the trial court to find that Suarez is unfit

---

[3]    It bears mention that when our Supreme Court recently considered the question of retroactivity of Proposition 36 in *Conley*, it did not hold that application of the *Estrada* rule was strictly limited to situations where an amendatory statute reduces the penalty for a particular crime, but rather analyzed the application of the *Estrada* rule to Proposition 36 on other grounds.  (See *Conley*, *supra*, 63 Cal.4th 646.)

5

for a juvenile adjudication, the judgment would be reinstated.  If, on the other hand, the juvenile court were to find that it would not have transferred Suarez to adult court in the first instance, his conviction and enhancements would be deemed juvenile adjudications and the juvenile court would impose an appropriate disposition under juvenile law.  (See *Vela*, *supra*, 11 Cal.App.5th at pp. 81-82, rev.gr.)

The majority posits that applying Proposition 57 retroactively would lead to "absurd results," in that even a hypothetical minor convicted of, and sentenced for, "special circumstance murder" in adult court, would thereby be entitled to a conditional remand for a fitness hearing and the opportunity for a rehabilitative disposition if the judgment in his case were not yet final.  (Maj. opn. *ante*, at pp. 39-40.)  The majority's concern about "absurd results" is belied by Proposition 57's stated goal:  to facilitate the rehabilitation of minors who have committed the most serious crimes.  In light of Proposition 57's emphasis on rehabilitation, extending the *opportunity* to obtain a rehabilitative outcome as broadly as possible is far from an "absurd result."  On the contrary, it gives effect to the voters' determination that specific crimes, in some instances, were erstwhile punished too severely in the case of minors.

In support of its holding that Proposition 57 is not retroactive, the majority next contrasts Proposition 57's amendments relating to juveniles with a separate provision relating to parole eligibility.  (Maj. opn. *ante*, at pp. 38-39.)  Specifically, the majority states that the "portions of Proposition 57 applicable only to juvenile offenders contain no express retroactivity provision" but "the provisions relating to eligibility for parole consideration" are made "expressly" retroactive "by making them applicable to '[a]ny person convicted … and sentenced.'"  (Maj. opn. *ante*, at pp. 38-39.)  The majority's assertion is puzzling because the provision concerning parole eligibility does *not* contain any "express" indication of retroactivity.  The provision states:  "Any person convicted of a nonviolent felony offense and sentenced to state prison shall be eligible for parole

6

consideration after completing the full term for his or her primary offense." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, § 32, p. 141.) This language simply reflects the nature of parole, specifically the fact that, in order to be eligible for parole consideration, a person must first be "convicted … and sentenced." The majority's suggestion that this language "expressly" renders the provision retroactive is misleading.

Finally, the majority believes that the fact that Proposition 57 "mandates that any motion to transfer the minor from juvenile court to criminal court 'must be made prior to the attachment of jeopardy,'" suggests an intent for Proposition 57 to apply prospectively only. (Maj. opn. *ante*, at p. 39, italics omitted.) However, a conditional reversal and remand of a pending case for a fitness hearing under Proposition 57—as the *Vela* court ordered in that matter—obviates any concerns about the attachment of jeopardy. Assuming it is a foregone conclusion that the prosecution would file a motion for a fitness hearing on remand, "[r]eversal of the judgment effectively operates to vitiate the prior attachment of jeopardy." (*Pineda*, *supra*, 14 Cal.App.5th at p. 483, fn. 10; see *Juan G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1494 ["voters are presumed to have been aware of existing law at the time an initiative was enacted"].)

7

Accordingly, I would apply Proposition 57 retroactively to this case.[4]

_____

                                                              SMITH, J.

---

**4**      I would also reject the People' argument, based on *People v. Villa* (2009) 178 Cal.App.4th 443, 452-453 (*Villa*), that even if Proposition 57 applies retroactively, remand is not required because it is not reasonably probable a juvenile court would retain Suarez's case instead of transferring it to criminal court.  In *Villa*, a juvenile defendant, directly charged in criminal court, was convicted of a lesser included offense for which direct filing was not permitted.  The trial court erroneously denied the defendant's request for a posttrial fitness hearing under Penal Code section 1170.17, subdivision (c), and instead relied on the probation report to conclude that the defendant could appropriately be prosecuted as an adult.  (*Villa*, *supra*, at pp. 452-453.)  The court's error was that it made the requisite determination without holding a statutorily-mandated hearing.  The Court of Appeal found the error to be harmless under the *Watson* standard of prejudice. (*Villa*, *supra*, at p. 453; *People v. Watson* (1956) 46 Cal.2d 818.)  In the instant case, Suarez was directly charged in criminal court under former Welfare and Institutions Code section 707, subdivision (d) but, unlike *Villa*, there was no occasion for any court to assess his fitness for a juvenile disposition.  Thus, in contrast to *Villa*, where the court assessed fitness but made a procedural error in doing so, here there was no error that may be deemed harmless.  Nor would it be appropriate to conduct a fitness evaluation, in the first instance, on appeal.  Accordingly, *Villa*'s harmless error analysis is inapplicable.

8